Good morning, Your Honors. My name is Adam Gasner, and I represent Victor Torres in the trial court, and I do here again today because this case is about, fundamentally, equal protection under the laws. Title 18, United States Code 923G5, seeks to prevent, based on status alone, Victor Torres, as well as perhaps at a minimum 13 million people here in this country, from having the right to defend themselves under the Second Amendment in the privacy of their own homes and other places. The Second Amendment applies to undocumented people. The First Amendment and the balance of civil rights apply to undocumented. The myriad of protections offered to undocumented under the First Amendment are unquestioned. The troika of criminal law amendments that I work with every day, the Fourth Amendment, the Fifth Amendment, and the Sixth Amendment, including as well, parenthetically, the Eighth Amendment and the Fourteenth Amendment, all apply to undocumented. I represent them on an appointed basis all the time. The Second Amendment is a substantial right to be conferred on all people in this country. The Heller case pointed out that it's a individualized right, which came towards the ability of one to protect oneself in the privacy of the home, with a firearm, and elsewhere. Well, it doesn't seem to me that Heller or Verdugo really answered the question. They don't really answer the question. It seems to me that Verdugo says the test is for the first, the second, the fourth, maybe the ninth, and the tenth. It refers to a class of persons who are a part of a national community or who have otherwise developed sufficient connection with this country. Thank you. Yes, Your Honor. Undocumented people in this country are a member of our national community. Well, I guess I'm having a tough time understanding how they are. For instance, right in Verdugo it says, quoting United States X-ray, Turner v. Williams, Excludable alien is not entitled to First Amendment rights because he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law. Thank you, Your Honor. I do believe fundamentally in opposition to the Verdugo case that a deportable alien has a right, for example, to free speech and to free religion. Well, if you read Turner, that's exactly what it says. I do understand that that's the statement in Verdugo, but I believe that the Constitution's interpretation of the First Amendment extends to undocumented Mr. Turner himself. Let's go on with another case about Bridges v. Wixom. Bridges v. Wixom is trying to decide another issue, and they say the Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country, he becomes invested with the rights guaranteed by the Constitution. So, again, in Bridges, we're not talking about just entering. We're talking about lawfully entering. And if we take that back and put it in the middle of Torres, it seems, again, we have to say they're part of the national community, or they develop sufficient connection with this country. Now, sufficient connection with this country is the important part, because it seems to me that one does not develop sufficient connection unless one has some legal right to be here. I disagree that you cannot establish a sufficient connection. Well, give me the case. I mean, all I'm trying to do is read you the cases and let you explain these interwoven ideas, because it seems to me that I've got to start with Verdugo, and then I've got to apply Heller. Heller doesn't talk about people. It talks about citizens, and it talks about people who are duly good, virtuous Americans. It even talks about Americans. But if we go back to Verdugo, it kind of lays it out. And so I'm trying to determine how I get the sufficient connection to be considered part of the community. Your Honor, Mr. Torres himself is an example of a child who was carried here in the arms of his parents, went to school here, lived here, had some employment here. And does that make it a connection? He didn't take any steps to make his status lawful. I agree that he became an adult, and he did nothing to meet with some unlawful status here. I agree, Your Honor. He is a white American citizen. There are things that financially or legally he could have done, probably to attain status would have prevented this case from going to court at the level that it did. There are certainly other statutes, other criminal laws that he broke. I'm not talking about any of those. We're talking about his possession of the weapon, which is terminalized because he wasn't lawfully with it. But he could have been lawfully with it. He could have sought lawful admission. The fact that he was brought here as a child didn't change that. When he turned 18, he could have voluntarily deported himself, or he could have otherwise taken steps towards lawful citizenship. This is a man with no pre-existing criminal record. Well, just a minute. There is just a little bit more history here than you want to admit to. I mean, we know the part you talked about thus far, but you haven't talked about that he was expelled, that he returned to Mexico, that he reentered three times after becoming an adult, every time he was allowed to return to Mexico. So he went. So he understood the whole of the process. He understood he had no, if you will, sufficient connection with the country to be considered a part, and now you want to make him a part. Your Honor, he grew up in San Jose, California. His parents lived, his siblings lived in San Jose, California. He went to school from the time he was an elementary school age boy in that county. This is the language that he knew, the people that he was friends with, the family that he had, and that he knew, all connected to him. Nevertheless, he was subject to deportation, as his neighbors were not. So he was subject to certain legal disabilities that the Jews might see. No, he had never illegally, he was never prosecuted for any legal re-entry. He had no other reasons that would prevent him from being in the country. He could have sought legal status, there is no doubt. But he didn't. But he did not. You've got about a minute left. Can I just throw out a different question, and that is, what are your thoughts on the approach of the 10th Circuit and the concurrence of the 7th in which the court avoided the analysis then with the assumption that it would apply in the intermediate scrutiny? Why wouldn't that allow the law to be availed? Your Honor, I believe preliminarily that with regard to the Bill of Rights, strict scrutiny should be applied in this case. Then why is that? Because it's applied in the context of all the other constitutional rights that are conferred to people under the Bill of Rights, pre-existing rights, in other words, it's not like a rights to vote or otherwise that are constitutional rights. This is a pre-existing inalienable right based on the Second Amendment, which was written, of course, at the same time. The Fourth, Second, and First were written, which all confer these rights to all the people, meaning people that are here within these boundaries. Of course, when those words were written, there was probably no question, there was I understand the reticence in not seeking to arm 13 million undocumented people with this. I'm asking this law to be unconstitutional. What I'm trying to do is seek to have the same laws applied equally among the people that are here. There has been no briefness in the finding. Well, that's a consequence of your argument, isn't it? No. Presumably, those who are admitted here lawfully, particularly U.S. citizens, can arm themselves and be subject to regulations where they can go to get the same rights. So, those who are not, I mean, 13 million, whether they're undocumented or not. That's what I understand. That's what I'm trying to do. Yes. That's what I'm trying to say. Let's hear from the government. Thank you. Thank you very much. We look forward to hearing from you. Good morning, Your Honor. Certainly pleased the Court billed a lot on behalf of the United States. Every court that has considered the constitutionality of 922G5 has upheld it. In fact, every section of 922G that has been challenged on Second Amendment grounds following post-Heller has been upheld. Since Heller, the five courts, as we noted in our brief, have considered the constitutionality under the Second Amendment of Section 922G5, and each one of those courts has found it to be constitutional. Now, three of those courts only dealt with the first step of the post-Heller analysis, which is to determine whether or not unlawful or unauthorized aliens even have rights under the Second Amendment. The Tenth Circuit, as the Court noted already, passed on that issue and assumed, for the sake of the argument, that they may have rights under the Second Amendment, but upheld the law under intermediate scrutiny because it is substantially related to an important government purpose. So, how do you get to this, the people? I think, I mean, I've read what these other courts have done, but I'm not sure they've really sufficiently analyzed that language. I mean, I read your brief. You said that the Supreme Court's use of law-abiding responsible citizen from Heller was the way to deal with people, but I'm not convinced it might have something to do with a part of the political community, but I'm not convinced that it's about connection. Otherwise, if that phrase defines the people, then citizen misdemeanors would be similarly excluded, would they not? Yes, Your Honor. And they're not under Ninth Circuit law? I think the phrase, the problem with the defendant's intratextual argument about the people, that should have the same meaning in every instance of its usage in the Constitution, is sort of twofold. Number one, we know that there are other provisions in the Constitution where the phrase, the people, is used, and it refers much more narrowly to citizens. I know of amendments where person is used, and it's a different idea, but with the people in the first, second, amendment, fourth, is pretty well, from all the stuff I read, similarly used. It's just how we determine what the people is or is meant to be. So I'm having trouble with the law-abiding responsible citizen. I'm having trouble with the virtuous citizen, which you argue in your review. You say many times, being members of a political community is a requirement for being of the people. You have to be a virtuous citizen. So would an alien who is rightfully here have Second Amendment rights under that definition? I think there's a stronger argument to be made that an alien who is in the United States legally, lawfully, would have a stronger claim to rights. Are they virtuous citizens? No, they're not citizens. Well then, I would have trouble with your definition about citizens. Fair enough, and I take the court's point. I think what the Fourth Circuit did was to acknowledge that, and the Fifth Circuit as well, was to acknowledge that it's possible that the phrase, the people, does not have one single definition throughout the Constitution. For example, in Article I, Section 2, and in the 17th Amendment, the Constitution says that senators and representatives are elected by the people in each state. And we know that at the time those provisions were enacted, the people in each state, number one, meant different things state by state, and number two was really about citizenship, property ownership, and those who were eligible to vote. So we know that's a very narrow definition of what the people is. Well, the only reason I'm giving you questions is there's some parts of your argument I had a tough time putting into my thought processes here. I mean, I read Verdugo, and it was pretty strict what it had to be for Verdugo. And it said the first, the second, and the fourth are all the same. We're not going to deal with the fifth. We're not going to deal with the fourteenth. We're going to deal with the first, second, and fourth. And then it tried to lay out the reasoning as to how one gets there, and it gave us two prongs, but it didn't seem like you really focused on the two prongs. That's what I'm trying to get you to do. Because it seems to be there have been courts which have said an alien gets a connection if they're an LBR. We have gotten courts saying an alien gets a connection. We might even go so far as some courts saying if they've even applied because they might leave the connection. And to happen in this case, is being here sufficient time enough of a connection? I think that is not the only factor. No, I'm not talking about the only factor. What I'm talking about is the substantial connection. Because if I read Verdugo, literally, it seemed to me that this court said he wasn't here very many days. Well, I think with Verdugo, actually, he wasn't here voluntarily either. Well, he was here voluntarily for some period of time, but not many days. Then he went back to Mexico, and they went and got his stuff in Mexico. And they said he had no connection. So I'm saying to the government, is the day enough? I don't think it is. And the reason I don't think it is is because in the United States versus Meza Rodriguez, when the Seventh Circuit applied this test, it noted significantly that Mr. Meza Rodriguez had been in the United States for, I think, 22 years consecutively. He was brought here as a child, never left. He had established substantial connections, not only by the number of years he was here, but by the fact that they were consistent. He never left. And he had engaged in employment and had other connections with the United States that Mr. Torres, as the court pointed out earlier, did not demonstrate. So are you saying it has to do with factors like whether or not what he did while he was here, how long he was here, or does it have to do with his status? I think it's both. We start with the fact that he did not have legal status. Now, tell me, because the next case won't be the next case today, but it'll be the next case on another calendar. I'll have somebody who is an alien who will be asking me to exclude certain evidence because it was taken in violation of the Fourth Amendment. We don't exclude it just because it was taken in violation of the Fourth Amendment. We only exclude it if it's taken and it is so obvious. If it was a violation that is extreme, then we exclude it. If we use that parlance in the cleanage proceedings before us, does that say that they have a Fourth Amendment right? Well, I don't know that Verdugo actually concludes. Verdugo doesn't conclude it, but I'm just trying to reconcile now my precedent, which is that if it's an extreme deviation of Fourth Amendment rights, I will exclude the evidence in a deportation hearing. As you get a deportation hearing, the context is different. It's a civil proceeding as opposed to a criminal proceeding, and the exclusionary criminal proceedings have a higher level of scrutiny than the civil proceeding. I think so, and I think the exclusionary rule would be applicable, whether the context is— But we had a criminal proceeding. Correct. So wouldn't we necessarily then have a Fourth Amendment right in this proceeding? And if we have a Fourth Amendment right, why not a Second Amendment? Well, I think that's what the court in the Fourth Circuit was trying to distinguish, which was that there may be rights enjoyed by unauthorized aliens under some amendments, but the fact that the Fifth Circuit said this, too, the fact that the phrase the people is used in those three amendments of the dog rights does not necessarily mean it has to have the same definition. And so instead of simply looking at the two words, the Fourth Circuit and Heller as well performed a historical analysis of what that right was, what was the right to bear arms at the time of the Second Amendment. And I think if the words of the people were not in the Second Amendment, then it would be an easy step. And that applies to aliens? I think it's pretty— Yeah, it was Second Amendment Day, so the aliens don't— Well, unfortunately, it wasn't as clearly written one way or the other. But I think the scholars that we've cited in our brief and the literature, as well as the opinions in Heller and in Carpe Ileo, make it pretty clear that the right to bear arms was something that was very humanly substantiated not only with citizenship, but with membership in a political community, and that it was a right, like a civic right, similar to the right to vote. Thank you. Thank you. Here's just how you're going to stand somewhere next year on your own.
judges: Kozinski, N.R. Smith, Gleason